

Signed/Docketed
November 19, 2013

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 08-19552 MER |
| PARKER EXCAVATING, INC., ) | |
| ) | Chapter 11 |
| ) | |
| Debtor. ) | |

## ORDER

In this claims objection proceeding, the Debtor seeks reduction of amounts paid by the Debtor's construction surety – claims for which the surety now seeks indemnification. The Debtor contends the surety's claim should be reduced for two reasons: first, it acted in bad faith by paying claims that were disputed, not owed or subject to defenses and offsets; second, it paid claims based on communications from persons who had no authority to approve payments. Thus, to determine the allowed amount of the claims, the Court must evaluate the good faith of the surety and the reasonableness of its reliance on the Debtor's communications.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b), and 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) because this matter involves the allowance or disallowance of a claim against the estate.

## BACKGROUND

Debtor Parker Excavating, Inc. ("PEI") operates a construction company. Prior to PEI's bankruptcy filing, Western Surety Company ("Western") issued labor and material payment bonds and performance bonds, naming Western as surety and PEI as principal, in connection with the following prepetition construction projects: the Miller Dam (Denver Water) Project; the City of Taos, New Mexico Project; the CDOT (Chaffee County) Project; and the Alamosa Project (in which PEI was a subcontractor to Castle Rock Construction) (collectively, the "Projects"). On July 18, 2003, PEI and Western entered into a General Indemnity Agreement covering the Projects.[1]

---

[1] Parker's Exhibit 1, Western's Exhibit A.

Almost five years later, PEI filed its voluntary Chapter 11 petition. Western filed Proof of Claim No. 119 on January 30, 2009, in the amount of $1,070,280.87. Subsequent to filing its proof of claim, Western added attorneys' fees and costs and notified PEI its claim amount was increased to $1,119,513.89. This corrected amount included the offset of $760,110.12 paid to Western by Denver Water, and $102,987.30 paid to Western by the City of Taos.

PEI's Chapter 11 Plan of Reorganization was confirmed June 6, 2012. Following confirmation, PEI objected to Western's proof of claim, alleging Western improperly paid thirty-five claims associated with the Projects.[2] PEI divided its objection into the following six categories: 1) Denver Water Project claims not owed; 2) CDOT Project claims not owed; 3) Denver Water Project time-barred or overstated claims; 4) Denver Water Project and Alamosa Project claims settled by court order and not owed; 5) Denver Water Project, City of Taos Project and CDOT Project overstated claims; and 6) Denver Water Project and CDOT Project claims unsupported by documentation from Western. In sum, PEI seeks a $778,530.98 reduction of Western's claim resulting in a total allowed amount of $340,982.91.

Western asserts each of the disputed payments was properly made. Western contends PEI's objections are barred by waiver and consent, and Western had proper authority to pay the Projects' claims under the terms of the bonds and the General Indemnity Agreement, and from agents of PEI. Further, Western argues the payments were justified because the cost of litigating disputed Project claims exceeded any potential recovery from litigation. According to Western, the documentation supporting the non-litigation approach was provided by PEI, and Western denies any obligation to provide the same documentation back to PEI.

## DISCUSSION

### A. Burden of Proof on Claims Objections

Western filed Proof of Claim No. 119 in accordance with FED. R. BANKR. P. 3001. "When the proof of claim is executed and filed in accordance with FED. R. BANKR. P. 3001 (including Official Form 10), the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim."[3]

---

[2] PEI originally objected to thirty-eight claims, but at trial withdrew its objections to three claims.

[3] *In re Richter*, 478 B.R. 30, 40 (Bankr. D. Colo. 2012); FED. R. BANKR. P. 3001(f) (stating "[a] proof of claim executed and filed in accordance with these rules shall constitute

Here, the Debtor objected to the allowance of Western's *prima facie* valid claim, and has "the burden of going forward with evidence supporting the objection."[4] To overcome the *prima facie* effect of a properly filed proof of claim, "the objecting party must bring forward evidence equal in probative force to that underlying the proof of claim, [and only] then is the ultimate burden of persuasion with the proponent of the proof of claim."[5] "Once the objecting party has reached this threshold, the creditor [claimant] has the ultimate burden of persuasion as to the validity and amount of the claim."[6] Thus, the ultimate burden of persuasion will shift to Western only if PEI overcomes the *prima facie* validity of Western's Proof of Claim.

**B.    Did Western Meet Its Duty of Good Faith and Fair Dealing?**

The parties acknowledge the operative General Indemnity Agreement provides in pertinent part as follows:

> [Western] shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against [Western] or the principal upon any such bond shall be settled or defended and its decision shall be binding and conclusive against the Indemnitors.[7]

Therefore, the General Indemnity Agreement accords wide latitude to Western in the handling of claims.

However, every contract governed by Colorado, including this one, imposes an implied duty of good faith and fair dealing.[8] Such a duty of good

---

*prima facie* evidence of the validity and amount of the claim.")

[4] *Richter* at 40 (quoting *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. BAP 2003)).

[5] *In re Fullmer*, 962 F.2d 1463, 1466 (10th Cir. 1992) (abrogated on other grounds, *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. 15 (2000)).

[6] *Richter* at 40-41 (internal citations omitted).

[7] Parker's Exhibit 1, Western's Exhibit A.

[8] *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003). "Under Colorado law, an insurer must deal in good faith with its insured." *Gustafson v. American Family Mut. Ins. Co.*, 901 F.Supp.2d 1289, 1303 (D. Colo. 2012) (citing *Decker v. Browning-Ferris Indus. of Colo.*, 931 P. 2d 436, 443 (Colo. 1997)).

faith and fair dealing applies to surety companies, such as Western, as well as traditional insurance companies.[9] As explained by the Colorado Supreme Court:

> The insurance contract imposes a "quasi-fiduciary" relationship between the insurer and insured that imposes an implied covenant of good faith upon the insurer. This special relationship gives rise to a separate action in tort when the insurer breaches its duty of good faith and fair dealing.
>
> An insurer may breach its duty of good faith due to the insurer's conduct with third-parties or with first-parties. The third-party context involves claims against the insurer for its alleged misconduct with third-parties asserting claims against the insured. By contrast, the first-party context involves claims against the insurer for its alleged misconduct with its own insured. To assert a claim for the breach of an insurer's duty of good faith, the tort requires proof of a different standard depending upon whether the insurer's conduct is with a third-party or a first-party.[10]

In the case at bar, PEI complains of Western's actions with respect to paying claims brought by third parties against PEI. Therefore, the instant dispute falls within the third-party context.[11] In order to establish Western breached its duty of good faith and fair dealing within this context, and to rebut the presumption of validity of Western's Proof of Claim, PEI must show a reasonable insurer or surety under the circumstances would have dealt differently with the claims at issue.[12]

"[T]he reasonableness of an insurer's conduct is measured objectively based on industry standards in both the first-party and the third-party

---

[9] *Transamerica Premier Ins. Co. v. Brighton Sch. Dist 27J*, 940 P.2d 348, 353 (Colo. 1997). *See also Riccatone v. Colorado Choice Health Plans*, ___P.3d___, 2013 WL 4875355, at *3 (Colo. App. Sept. 12, 2013), and *Ground Improvement Techniques, Inc. v. Federal Insurance Company*, 2008 WL 1700408, at *2 (D. Colo. April 8, 2008) (Not Reported in F. Supp. 2d) (both citing *Transamerica*).

[10] *American Family Mut. Ins. v. Allen*, 102 P.3d 333, 342 (Colo. 2004) (citations omitted).

[11] *See Transamerica*, *supra*, at 354 (noting obligees in a suretyship agreement are analogous to third-party beneficiaries because a suretyship agreement is designed solely for the obligees' benefit). In this case, the claimants against PEI that were paid by Western paid are the obligees.

[12] *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004) (citing *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1142 (Colo. 1984)).

context."[13] In Colorado, a surety "acts in bad faith when its conduct is unreasonable and it knows that its conduct is unreasonable or recklessly disregards fact that its conduct is unreasonable."[14] As noted by the Colorado Supreme Court:

> We recognize that the commercial surety is put in an awkward position in handling simultaneous claims made by the principal and the obligee. The Supreme Court of Hawaii has explained the surety's dilemma as follows: Clearly, the surety owes a duty of good faith and fair dealing to both the principal and the obligee on the bond. If the surety pays too quickly to the obligee, it may invite liability claims from the principal. Conversely, if it refuses to pay anything pending an arbitration or judicial proceeding to determine its liability on the bond, the surety may incur liability to the obligee for failing to act promptly on a valid claim.[15]

Here, Western denies having any motivation to accelerate the payment of claims or to overpay the claimed amounts. However, Western has several conflicting incentives, and cannot simply assert its payment of claims prevents a violation of the duty of good faith and fair dealing. Instead, this Court must evaluate whether Western's payment of claims is contrary to what a reasonable surety would do in similar circumstances under the industry standards.

The Court heard testimony of Greg Parker ("G. Parker"), Lester Parker ("L. Parker"), Janet Turner ("J. Turner") and Larry Turner ("L. Turner"). The Turners are consultants for PEI. In addition, testimony was received from Isaiah Cline ("Cline"), Western's claims representative, and Charles Groves ("Groves"), Western's consultant. This evidence definitively demonstrated representatives of both PEI and Western investigated the disputed claims. PEI supplied most of the documentation and information about the disputes, but Cline and Groves occasionally interacted directly with claimants. Groves admitted he did not visit construction sites associated with the claims because at the time the claims were under review, the construction projects were complete or nearly complete. Groves asserted, and this Court agrees, there would have been little to be gained from such visits besides additional expense for PEI.

---

[13] *American Family*, *supra*, at 343 (citations omitted).

[14] *Transamerica*, *supra*, at 353-54 (citing *Travelers Insurance Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985).

[15] *Id.* at 353, n.4 (quoting *Board of Dirs. of Ass'n of Apartment Owners v. United Pac. Ins. Co.*, 77 Hawai'i 358, 361-62 (1994) (citations omitted)).

Rather than physically inspect the construction sites, Western requested and obtained documentation for the claims from PEI, along with statements the claims were valid and should be paid.[16] Groves then reviewed the documentation and paid the claims.[17] Western did not simply pay claims as they were asserted by the claimants. Instead, the exhibits demonstrate in almost every instance Western waited until obtaining both documentation and permission from PEI's representatives prior to paying claims. With respect to the claims for which there were no emails from PEI approving payment, the evidence shows Western made the decision to pay or settle the claims based on its own investigation. The Court's independent review of the specific claims, objections to the claims, and exhibits associated with the payment of the claims, is reflected in the summary attached hereto as Appendix A.

G. Parker and L. Parker (the Parkers") along with their insurance agent Frank Penn ("Penn") and their corporate attorney Stephen Hess ("Hess"), assert Cline and his superiors ignored their objections to claims, and refused to consider PEI's possible defenses to claims. The Court agrees with PEI that a surety such as Western must perform a reasonable investigation.[18] However, as described above, Western performed an investigation, and the Court finds it was reasonable under the applicable industry standards and the circumstances of this case.

Specifically, the testimony presented clearly indicates the Parkers, Penn and Hess did not enjoy working with Cline.[19] However, the unfavorable working relationship in this case does not indicate the parties failed to act in good faith. Moreover, Western's hiring of Groves, a consultant with twenty-three years of experience in the construction industry, and relying on Groves' investigations, actually supports a finding of good faith and reasonable actions under standards

---

[16] *See* Western's Exhibits W, AA, BB, GG, KK, JJ, LL, OO, QQ, TT, VV, RRR, VVV, BBBB, and JJJJ

[17] *See* Western's Exhibits 3R, 4D, 4S, 4T, 4U, 4V, 4W, 4X, 4Y, 4Z, 5A, 5B, 5C, 5D, 5E, 5F,  5H, 5J, 5K, 5L, 5M,  5N, 5O, 5P, 5Q, 5R, 5S, 5T, 5U, 5W, 5X, 5Y, 5Z, 6A, 6B, 6C, 6D, 6E, 6F, 6G, 6H, 6J, 6K, 6L, 6M, 6N, 6O, 6P, 6R, 6S, 6U, 6W, 6X, 6Y, 6Z, 7A, 7C, and 7D.

[18] *See Maryland Casualty Co. v. R & L Const. Co.*, 368 S.W. 2d 134, 135 (Tex. App. 1963) (cited by PEI). *See also Cary v. Automobile Ins. Co. of Hartford*, 838 F. Supp. 2d 1117, 1126-27 (D. Colo. 2011) (An insurer should conduct a reasonable investigation, but more than mere negligence in conducting such an investigation is necessary to prove a bad faith breach of an insurance contract.).

[19] G. Parker, L. Parker, and Penn characterized Cline as uncooperative during conversations. Cline described the parties' relationship as "contentious," but he did not believe it was as difficult as the Parkers and Penn asserted.

in the industry.[20] Thus, the Court cannot agree with PEI that Western lacked good faith in relying on Groves' investigations.

In addition, the Court does not agree Western's investigation and collection of documentation was "minimal," or lacked "credibility." Western paid some claims which PEI contends were subject to valid defenses, but PEI has not shown the decision to pay those claims was unreasonable or uneconomical. Although PEI asserts Western failed to provide PEI with documentation to enable it to pursue arbitration or litigation of some claims, PEI did not show Western shielded any documents from PEI or refused to provide documents to PEI.

Therefore, based on its review, and the testimony of the witnesses, the Court finds Western performed reasonable investigation and made business decisions to pay claims based on documentation obtained primarily from PEI. The Parkers did not always agree with the payment of the claims or with the amount paid, but the exhibits and the testimony of Groves, Cline, and the Turners demonstrate Western did not violate its duty to act in good faith. Nowhere in the case law is "good faith" construed to mean "as the principal desires." Therefore, the Court finds PEI has not met its burden of supporting its objections to the claims on the basis of lack of good faith. Even if the Court found PEI met its burden, which the Court is not inclined to do, Western's evidence at trial successfully rebutted the arguments presented by PEI.

### C. Did PEI's Agents have Authority to Approve Payments and was Western's Reliance Reasonable?

There is no question the Parkers (as the principals of PEI) had the authority to approve payments of disputed claims. While Western obtained many approvals directly from the Parkers, Western also received a number of approvals from Stacy Parker ("S. Parker"), J. Turner and L. Turner. Thus, the final issue is whether S. Parker, J. Turner and L. Turner had the authority to approve payments of disputed claims on behalf of PEI, and whether Western properly relied upon such approvals.

---

[20] In fact, Hess stated Western was "diligent" about putting together initial documentation for claims, but believed Western was not interested in pursuing defenses he was proffering on behalf of PEI. *See* Transcript, Vol. II, p. 88, lines 5-19. However, while Western may have chosen not to pursue defenses urged by PEI's attorney, such a choice does not demonstrate Western knowingly or recklessly acted unreasonably, in contravention of *Transamerica* and *Savio*. Moreover, the Court finds Penn's opinion of Western's behavior, while also based on years of experience dealing with insurance companies, provided more information as to PEI's difficulty in getting along with Western's representatives and less information as to the standards of the industry.

Colorado law recognizes an agent may possess either express or implied authority. Actual or express authority is "that authority which is in fact given to an agent."[21] Implied or apparent authority is "actual authority circumstantially proved," established "by evidence of the principal's acquiescence with knowledge of the agent's actions, and such knowledge may be shown by evidence of the agent's course of dealing."[22] Thus, actual authority incorporates the concepts of express and implied authority.[23] Conduct of a principal which, reasonably interpreted, causes a person to believe the principal consents, may demonstrate implied or apparent authority.[24] Apparent or implied authority protects third parties who, in good faith, rely upon their belief that an agency relationship exists between the apparent principal and agent.[25] Therefore, if an agent acts under actual or apparent authority, a principal may be bound by those actions regardless of whether the principal has knowledge of the agent's conduct.[26]

According to their testimony, the Parkers told Cline in 2007 they were the only persons who could approve payments. However, this statement was made approximately one year before PEI filed for bankruptcy protection, and more importantly, this statement was made in connection with an unrelated project not at issue. Following this statement, PEI suffered financial setbacks due to unexpected costs and other factors, leading to filing this bankruptcy case.

In contrast, the evidence shows the Turners and S. Parker had actual authority with respect to the Projects because, according to the Turners, payment approvals were cleared through G. Parker or L. Parker before ever being communicated to Western.[27] Thus, the emails sent were simply communicating authority to make payments approved in advance by G. Parker or L. Parker. J. Turner's testimony, which the Court finds credible, reflects she

---

[21] *Citywide Banks v. Armiho*, 2011 WL 4837501, at *5 (Colo. App. Oct. 13, 2011) (Not Reported in P.3d) (citing *Life Investors Ins. Co. v. Smith*, 833 P.2d 864, 868 (Colo. App. 1992) and *Aquaduct, L.L.C. v. McElhenie*, 116 S.W.3d 438, 442 (Tex. App. 2003) ("Actual authority denotes that authority which the principal . . . by want of ordinary care allows the agent to believe himself to possess.")).

[22] *Wiley v. Meyer*, 876 P.2d 1260, 1264 (Colo. 1994).

[23] *Id.*

[24] *Rush Creek Solutions, Inc. v. Mtn. Ute Tribe*, 107 P.3d 402, 407 (Colo. App 2004).

[25] *Id.*

[26] *Id.*

[27] *See* Western's Exhibit UU, Janet's notes of conversations with L. Parker.

discussed all items with L. Parker before sending them on with an "ok to pay" email. The Court also finds L. Turner's testimony, indicating he cleared items in advance with L. Parker, to be credible.[28] Therefore, the Court finds it reasonable for Western to believe the statements made on the emails were made with the consent of L. Parker or G. Parker based on their actual authority.[29]

Even if express authority did not exist, PEI did not object to the communications sent to Western by S. Parker, J. Turner and L. Turner, even though the emails made representations on behalf of L. Parker and G. Parker. This creates a course of conduct by PEI giving S. Parker and the Turners apparent or implied authority to approve payments as well. The Parkers were copied on these emails, providing additional support to such a finding. The Parkers' failure to review or object to the emails also supports the conclusion Western properly relied on such communications. Accordingly, the Court determines S. Parker, J. Turner and L. Turner had both actual and apparent authority to issue communications authorizing the payments, and Western reasonably relied upon such authority to make payments on disputed claims.

## CONCLUSION

PEI has not met its burden of overcoming the *prima facie* validity of Western's Proof of Claim No. 119. PEI failed to show Western breached its implied duty of good faith and fair dealing or relied wrongly on communications from S. Parker and the Turners. Even if the burden shifted to Western, which

---

[28] The Court also finds L. Parker and G. Parker to be credible witnesses. L. Parker admitted he did not use email and would have had another person, either S. Parker or the Turners, send emails on his behalf and respond to emails sent to him. In addition, at the time he was reviewing claims with S. Parker and the Turners, he was recovering from a very serious accident and was taking medications which may have affected his memory. G. Parker admitted that he too was not "computer savvy" and did not use email. He acknowledged he spent most of his time in the field after his father's injury, and would not have been in the office very much. He also admitted he was extremely overworked and exhausted at the time the disputed claims were being incurred and reviewed. For these reasons, the Court finds the emails sent by S. Parker or the Turners had the express authority of G. Parker and L. Parker, even if the Parkers' recollection of discussions with S. Parker and the Turners is imperfect.

[29] PEI argued S. Parker did not have authority to approve claim payments and states she was ill at the time the claims were being reviewed. The Court is cognizant of how stressful and difficult the illness of S. Parker must be. However, S. Parker's illness is a red herring. For the reasons above, she held both actual and apparent or implied authority to approve payments, whether she was ill or well. Moreover, no evidence was presented to show when or if the Turners, Groves, or Cline were informed of her illness, and, more importantly, no evidence was presented to contradict J. Turner's testimony she and S. Parker met with L. Parker and received permission to send emails approving claim payment.

the Court finds it did not, Western presented sufficient evidence to support the amount and validity of the Proof of Claim. Western employed a system of evaluating claims and making decisions based on documentation and permission to make payments from members of PEI with authority from L. Parker and G. Parker. Western reasonably relied on the authority of S. Parker, J. Turner, and L. Turner as agents of PEI because they discussed the disputed claims with the Parkers and sent written communications approving most payments. Based on the evidence presented,

IT IS THEREFORE ORDERED the Debtor's Objection to Western's Claim is overruled, and Western is allowed a claim against the bankruptcy estate of PEI in the total amount of $1,119,513.89.

Dated November 19, 2013  BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge

### CATEGORY I:  WESTERN PAID CLAIMS ON THE DENVER WATER PROJECT PEI DID NOT OWE

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection | Exhibits Showing PEI's Approval | Exhibits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 13,158.00 | 8 | Naranjo Construction | G. Parker: no signed tickets, work not performed | AA--S. Parker approved | 4S--Groves reviewed; notes ok'd by Bonnie; 6U is check |
| $ 33,394.62 | 9 | Pipe Valve & Fitting | G. Parker: invoice items removed; unsigned tickets | JJ--J. Turner approved | 4T--Groves reviewed; shows interest negotiation and ok's by J. Turner; 7A is check |
| $ 30,320.00 | 10 | Mountain Man Welding | G. Parker: invoices don't match signatures | | 4U--Groves reviewed and found $30,320 to be paid, noted $10,000 being held by claimant |
| $ 12,000.00 | 11 | Faris Machinery | G. Parker: offered to help Western buy equip. | | 4 H shows matter settled according to L. Turner; G. Parker admitted he auth. L. Turner to make a $12,000 offer; 6J is check |
| $ 13,130.00 | 12 | Evergreen Caissons | G. Parker: invoices unsigned, no backup docs. | W and AA--S. Parker and J. Turner approved | 4V--Groves reviewed, PEI recommended payment; 6J is check |
| $ 19,000.00 | 13 | Ellis Construction | G. Parker: forms taken and not returned | 3V shows L. Turner settled for $19,000 | 5P--Groves reviewed--notes $21,551.64 covered by bond; 6G is check |
| $ 12,374.00 | 14 | Dana Kepner (Den. Water) | G. Parker: equip. not used; unsigned invoices | 3R shows settlement totaling $37,500 | 5Q--Groves reviewed; 6E is checks for $25,126 and $12,374 totaling $37,500 |
| $ 25,726.69 | 15 | Colorado Engineering | G. Parker:  all items removed from contract | OO--J. Turner approved did not dispute amt. | 4Y --Groves reviewed and payment approved by PEI with reduction from $32,541; 5Z is check |
| $ 10,246.28 | 16 | Griffin Dewatering | G. Parker: no signed tickets, contract expired | | 4Z--Groves reviewed payment was "per Parker"; 6L is release |
| $ 83,762.68 | 17 | Colorado Machinery | G. Parker: for scrapers not used on project | TT--J. Turner ok'd $83,762.68 and $29,495.93 | 4X--Groves reviewed PEI recommended paying; 6B is check |
| $ 13,585.87 | 53 | Brundage Bone | G. Parker: only some tickets signed; backcharges | W-J. Turner ok'd $14,245.69; BB lowers to$13,585.87 | 4W--Groves reviewed and PEI recommended paying $13,585.87; 5Y is check |

### CATEGORY II:  WESTERN PAID CLAIMS ON THE CDOT PROJECT PEI DID NOT OWE

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection | Exhibits Showing PEI's Approval | Exhibits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 1,609.00 | 18 | Mesa Excavating | G. Parker: they were not needed, unsigned bills | AA--S. Parker ok'd payment | 5A--Groves reviewed--notes PEI recommended paying; 6S is check |
| $ 3,276.00 | 19 | Desert Plains Electric | G. Parker: invoices were from wrong project | QQ--J. Turner ok's $3,276.70 from CDOT project | 5B--Groves reviewed found amount to be paid was $3,276.70; 6F are checks for $5,636 and $3,276.70 |

### CATERGORY III:  WESTERN PAID A CLAIM IN THE DENVER WATER PROJECT THAT WAS TIME BARRED AND OVERSTATED

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection | Exhibits Showing PEI's Approval | Exhibits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 56,502.00 | 20 | Contour Consulting Eng. | G. Parker: overstated, no longer assert timeliness | 4J--L. Turner indicates claim settled | 5C-Groves reviewed-PEI ok's $12,272.14 and $10,920, and disputed $20,705, but Groves found amount documented by Contour; 6C is check |

### CATEGORY IV:  WESTERN PAID CLAIMS  ADJUDICATED AND NOT OWED BY PEI

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection | Exhibits Indicating Approval by PEI or Western | Exhbits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 25,000.00 | 21 | High Mtn Const. (Den. Water) | G. Parker: def.work; admits settled btw. Insurers | 4D--Al Wolf settled on behalf of Western only | 4D--Al Wolf settled on behalf of Wesetrn only; case dismissed; 6 N is release |
| $ 25,126.00 | 22 | Dana Kepner (Den. Water) | G. Parker: back charges, no payments before litig. | 3R shows settlement totaling $37,500 | 5Q--Groves reviewed; 6E is checks for $25,126 and $12,374 totaling $37,500 |
| $ 6,307.00 | 23 | Colorado Gravel (Alamosa) | G. Parker: Castle Rock paid and there were offsets | EE--Cline believed this amount payable | 5D--Groves reviewed indicated PEI recommended payment through Hess email in amt of $25,988.81; 6A is check |
| $ 9,551.90 | 24 | Grand Junct. Pipe (Alamosa) | G. Parker: believed on Castle Rock's bond on C.R.'s bond, no payments before litig. | EE--Cline believed this amount payable | 5E--Groves reviewed indicates PEI, through Hess, approved $9,551.90--Western did not pay disputed $915.30; 6K is check |
| $ 64,194.43 | 25 | Southwest Redi-Mix (Alamosa) | G. Parker: on C.R.'s bond, no payments befor litig. | EE--Cline believed this amount payable | 5F--Groves reviewed--PEI, through Hess, did nto disputed $64,194.43; 7C is check |

### CATEGORY V:  WESTERN PAID OVERSTATED CLAIMS

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection & Amt. Overpaid | Exhibits Showing PEI's Approval | Exhibits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 156,489.93 | 26 | La Farge | OBJECTION WITHDRAWN | | |
| $ 28,273.11 | 27 | Bestway Concrete (Den. Water) | G. Parker:  some loads rejected-$23,263.11 | W--J. Turner ok'd payment | 5H--Groves reviewed--PEI recommended payment of $28,271.11; 5X is check |
| $ 104,523.50 | 28 | Northwest Pipe (Den. Water) | OBJECTION WITHDRAWN | | |
| $ 127,057.24 | 29 | Performance Equip. (Den. Water) | G. Parker: no rentals, litigation settled-$56,000 | B-S. Parker ok'd; 4N aff by G. Parker re frozen funds | Settled on morning of trial--6Z check for $56,000 and $71,057.24 with settlement |
| $ 12,540.00 | 30 | Vialpando (Den. Water) | G. Parker:  tickets not signed-$2,140 | VV--J. Turner stated ok'd by PEI management | 5K--Groves reviewed; payment of $12,540 approved by PEI; 7d is check |
| $ 131,860.00 | 31 | Polk Oil (Taos) | OBJECTION WITHDRAWN | | |
| $ 36,240.05 | 32 | Pavement Mntc (CDOT) | G. Parker: more than arb award-$18,307.07 | W and AA- S. Parker and J. Turner approved | 5J--Groves reviewed shows PEI recommended paying $36,240.05; 6X is check |
| $ 8,252.32 | 33 | M2 Surveying (CDOT) | G. Parker:  obj. to all above $5,300-$2,952.33 | OO & YY--J. Turner listes $8,573.34 as disputed | 6 R is check for $8,252.32 |
| $ 89,584.80 | 34 | ISCO (CDOT) | G. Parker: since paid can't assert def.-$44,492.40 | PP--J. Turner ok'd $89,584.80, not entire $96,136.56 | 5L--Groves reviewed, ISCO withdrew several items; 6O is check |
| $ 10,925.00 | 35 | Hard Rock (CDOT) | G. Parker: arb. Award less--$8,899.37 | AA--S. Parker ok'd payment | 5M--Groves reviewed; PEI recommended paying the amount; 6M is check |
| $ 25,934.00 | 36 | ACA (CDOT) | G. Parker: arb. Award less--$13,888.30 | | 5W shows ACA paid $25,934 |
| $ 3,341.34 | 37 | Pelino Excavating (CDOT) | G. Parker: state rejected materials-$1,670.67 | W, AA, PP--S. Parker and J. Turner ok'd | 5N--Groves reviewed; PEI recommended paing $3,341.34; 6Y is check |
| $ 29,495.93 | 38 | Colorado Machinery (CDOT) | G. Parker: arb. Found overstated-$27,230.40 | TT--J. Turner ok'd $83,762.68 and $29,495.93 | 4X--Groves reviewed; PEI ok'd payment of PEI ok'd  payment; 6B is check |

### CATEGORY VI:  WESTERN DID NOT PROVIDE DOCUMENTATION FOR ARBITRATION PURPOSES

| Amount | PEI Exh. # | Claimant | Testimony Re PEI's Objection | Exhibits Showing PEI's Approval | Exhibits Showing Western's Actions |
|---|---|---|---|---|---|
| $ 10,992.50 | 39 | Parker Steel (Den. Water) | G. Parker: lack of documentation | GG & PP--J. Turner ok'd payment | 5T--Groves reviewed and paid per J. Turner; 6W is check |
| $ 47,200.00 | 40 | J. Grieves (Den. Water) | G. Parker: admits 78 pgs supplied with Exh. AA | W & AA--S. Parker and J. Turner approved $47,200 | 5S--Groves reviewed; PEI recommended paying; 6P is check |
| $ 8,912.70 | 41 | Desert Plains Elec. (Den Water) | G. Parker: lack of documentation | QQ--J. Turner found $5,636 ok for this project | 5U--Groves reviewed--$5,636 due as of No. '08; Exh. 5B shos $3,676.70 ok--together equals $8,912.70-; 6F is the two checks |
| $ 21,395.90 | 42 | Covarrubius (Den. Water) | G. Parker: lack of documentation | I-retention and changes owed--no signature | XX-says $5,152 can be paid, but $16,224,90 not yet paid to PEI; 5R shows Groves reviewed and $21,375.90 due as of Nov. '08; 6D is check |
| $ 4,845.00 | 43 | Mountain Man Welding | G. Parker: lack of documentation | LL & PP--J. Turner says PEI agreed to $4,845 | |
| $ 13,670.00 | 44 | Envt'l Logistics | G. Parker: admits 4 pgs supplied with Exh. AA | W & AA--S. Parker and J. Turner approve | 5O--Groves reviewed; PEI recommended paing $13,670; 6H is check |

**Total**
$ 1,329,797.79